Good morning, Shauna Lazaro on behalf of Petitioners. May it please the Court I'd like to reserve five minutes for rebuttal. This case is about the Clean Air Act requirement that every new pollution source be offset by real emission reductions. Let me jump a little bit to the chase. Is this case now only about whether we should remand it with or without vacating the rule? Yes, Your Honor. That is the only thing at issue in this case at this point. The other side is saying please send us back. Your Honor, EPA has specifically made a motion saying please send us back. But don't vacate what we've done even though it's wrong. That's correct, Your Honor. But in the course of making that request and jumping right to that point, in the course of making that request, EPA has not made the showing that would be required for remand without vacature. But if we remanded granted vacature, you save all your arguments for the next time if they make the same error, right? Your Honor, if they make the same error, they will make the same error because this rule Right, but we can't. I mean, in terms of relief you want, you get that if the rule is vacated. True? Your Honor, if the rule is vacated, we absolutely get the relief that we want. That's all we're asking for today. What relief is it that you want? You want to get rid of the rule? Yes, Your Honor. And vacating the rule is important. Why? Now that's, what's my next, what are the real, this is kind of an equitable thing that we're dealing with. What are the real world, practical, not, it may happen. What's going to happen if we don't vacate the rule? So, Your Honor, that is exactly the critical question. Well, I asked it. Thank you for the compliment. Answer it. Well, we're all friends up here. The critical point is that EPA needs to make a showing that there will be irreparable harm to the interest protected by the Clean Air Act. Did you hear the question? If this rule stays in place. Did you hear the question? Yes, Your Honor. Okay, we know what the standard is. We know what the showing needs to be. Judge Todd asked you a question, and I would like to hear the answer to it. I don't want any throat clearing. I don't want any compliments. I would like an answer to his question. What are the real world consequences of failing to vacate? Okay? That's all I hear. Yes, Your Honor. Failing to vacate means that this power plant continues to build and potentially begins operating depending on the time frame. Potentially. Here we go. Potentially. I'm sorry, Your Honor. Potentially doesn't mean it will happen. It's potentially. Potentially not. I mean, that's not impressing me. Your Honor. The power plant is not yet built, correct? Your Honor, the power plant is built to, I believe it's approximately 20 percent built. That's all? So there's 80 percent left to go? How much, based on the 20 percent that's been built, how long is it going to take for this thing even to be ready to operate? Your Honor. Another how many months, weeks, days, years? Your Honor, there is a contract for the purchase of this electricity by Southern California Edison that has a schedule for delivery. The construction harms are real, however. When does that contract kick in? Your Honor, I don't have that date before me because that is not the primary harm from failing to vacate, which is the answer that was posed, is the fact that this construction is ongoing. And the second harm is that. But it's not polluting anything, right? It absolutely is polluting, Your Honor. The construction harms are. The Energy Commission, which is the state agency primarily tasked with analyzing. It's not based on the challenge. It's not based on the construction harms, right? It's based upon the actual production of energy. Your Honor, this power plant cannot. Vacating will stop the continued construction of the plant? That's correct, Your Honor. How does that work? In the South Coast Air District, a new source cannot construct, cannot have a permit to construct without surrendering valid offsets that are valid for federal purposes. That's federal law in this region. So the permit to construct becomes invalid when the rule is vacated. That's why petitioners aren't asking, don't need to ask for any sort of injunctive relief. It happens automatically. Just as occurred in the Center for Food Safety case where the court concluded that it didn't need to issue an injunction granting or stopping the plant. It happens automatically. Exactly. It's supposed to be a pretty good argument for not stopping it. I mean, you've got a contract in place. You've got people working. You've got, you know, all the losses that come from stopping construction in the middle. Rentals of equipment and so on. It sounds to me like a huge cost. And if the plant is not going to, it can't actually operate, right, until further steps are taken. Your Honor, it can't actually build until it has valid. You've just made a good argument for allowing the building to continue. Your Honor. I mean, it's huge. If you're correct, the thing has to stop cold. This is a big operation. It employs lots of people. So, Your Honor, regardless of whether or not we have no evidence to support that, what I'm saying is. . . Well, you said it. We asked you a question. You answered it. That's right, Your Honor. The answer is construction will have to stop. And that is absolutely the remedy that we are seeking. Oh, I see. We don't have any evidence that people actually work during construction or that they get paid or that there are contracts. I see. We have to assume that that happens because that's what happens in the real world when you build something. So, Your Honor, this court, if it were going to weigh that side of the equities, would be making a clean break from Ninth Circuit precedent and, in fact, taking D.C. Circuit precedent on vacature a step even further. Which precedent would we be violating by doing that? Which case? So, Your Honor, the two Ninth Circuit cases, Western Oil and Idaho Farm Bureau, are the cases where this circuit has articulated the standard, which is a very high standard. It's also an equitable standard. It's a variable. That's right, Your Honor. And it's nicely summarized in the District Court decision on the Center for Food Safety, which goes through the equitable considerations that this circuit and the D.C. Circuit have applied. None of them is looking at the economic harm to an actor that is benefiting from an, frankly, illegally adopted rule. That's not the equitable consideration that goes into this. Now, this is probably a question for the other side, but do you know what, if anything, has been happening, been going on to ameliorate the mistakes since the September request to remand? Your Honor, to my knowledge, nothing. We haven't received any. Communities, if such any sort of remedying were underway, should have received. It would seem to me that if somebody on that side woke up and said, uh-oh, we need to start over again, they wouldn't be waiting for us to say go. They would have started in September, and they even offer a new notice and comment period. One might hope, Your Honor, which is why I would urge this Court to take that action and vacate the rule because I do think that it's clear that without this Court's order, the rule is going to stay exactly in place. The missing documents that were not indexed, when did you get those and how? Your Honor, communities had those documents on a CD six months, eight months before the EPA proceeding began, but communities had interacted with those documents, those 62 files, extensively submitting expert testimony, analyzing them. Communities knew that these documents did not match EPA's description of the documents that it was reviewing in its rulemaking. So having these documents that did not have two years' worth of annual emissions records, that had not been reduced to reflect surplus, it was extremely deceptive to have a notice from EPA saying, we've reviewed two years' worth of annual emissions records for every single offset. We're approving every single offset in this list as valid. We see that there are no surplus adjustments need to be made. Communities looked at what they had and said, they must have other documents. We had been through an administrative proceeding at the state level and knew what was in those documents. It was not the same thing that EPA was describing in its notice of proposed rulemaking. Did anybody ever agree on the same year? There's a dispute between whether you used 2002, 2003, 2007. Is there an agreement yet as to which year controls? Your Honor, the EPA relied on the 2007 attainment plan in its rulemaking. Communities rely on that and analyze. But they now say it should have been a different one, correct? They posit that maybe they should have. I don't think they've gone so far as to say, oh, yes, we should. And, in fact, if they were to do that on remand, I believe the EPA has requested judicial notice of its approval of the 2007 attainment plan in November of 2011. So the idea that they could go back, do another rulemaking, and rely on the 2003 plan, because the 2007 plan hadn't been approved yet, even though it is now approved, is kind of circling around, circling around. The 2007 plan is the plan. That's the plan that EPA has to rely on to find whether these offsets predate or postdate the planning base year. We'll see whether they agree with that. You've got about four minutes. You want to save it for a button? Yes, please. Thank you, Your Honor. You're the only one arguing for your side, right? That's correct, Your Honor. Thank you. Hello. You're Ms. Dona? Yes, may it please the Court. My name is Amy Dona. I'm representing the United States of America. And are you splitting time? We would like to split time. Well, you've got 15 minutes on the clock there, and whatever you leave. All right. As before said, I will let you know that at the council table also is Barbara Baird, representing South Coast Air Quality Management District, and Michael Carroll for Sentinel. And we were hoping that South Coast would have approximately three minutes to speak and Sentinel to have five minutes to speak since this rule. The SIP revision is proposed by South Coast, and Sentinel is the source that is the subject of the SIP revision. Proceed. Before the Court is petitioner's challenge to EPA's approval of the SIP revision. Judge Trott is correct in his analysis that the heart of the matter before the Court at the moment is the issue of remedy. EPA has identified on what- So what is your answer to Judge Trott's question about the real world effects or the practical difference between vacater and non-vacater? What is your answer to that? You heard the opposing counsel's answer, and I for one would like to hear what your answer is to that same question. Sentinel can speak best as to how the real world effects that it will- Will it stop construction in its tracks, as the other side says? My understanding is no, that it will not, that there isn't a SIP requirement that requires- You know, I'm a little nervous by you saying your understanding. Right, that's not a- My understanding is often confused. This is not- The other side says it's a question of arithmetic. You know, bang, construction stops, pow. They do, and they did not cite- We're really not asking for your personal opinion. We're really asking for the position of the United States and the position of the EPA whom you represent. And if they take the position that construction stops, my guess is construction will stop. If they take the position that construction won't stop, then maybe this is more of a question. So I'd just like to- Not your guess or anything like that or your sort of personal opinion, but what is the position of the clients you represent, the United States and the EPA? We do not believe that construction will be required to stop. I do not know of a requirement that's incorporated into the SIP that would require construction to stop. You say in your brief, vacatures should not have a direct consequence on Sentinel's ability to construct. Right. Can you stand by that? Yes. Today. Somebody's going to try to throw a monkey wrench into that one. Certainly. So why not then vacate? Because it creates an environment of uncertainty for Sentinel. As indicated, petitioners do believe that there would be a requirement for construction to stop, and surely we think it is likely that they would then proceed forward seeking some sort of judicial review of that assertion. Is there a case that says an environment of uncertainty is a standard by which we should make a decision on vacater or not vacater? No. Obviously, any time you vacate a rule, you create an environment of uncertainty, don't we? That's correct. Your site itself seems to admit that somehow this was maybe arbitrary, capricious, and violation of law. I mean, you see serious flaws enough to want to start over again. Am I right? And one of those flaws is that you may have chosen the wrong year. That sounds like a pretty serious flaw. A lot of the other stuff, documents here, documents there, but if you've got the wrong year, that strikes me as a serious problem. Well, let me tease out the difference between a flaw in the rule versus a flaw in the reasoning that was adopted for the rule. We have no reason to believe that the rule that was approved, at least based on the information that's before the agency at the moment, that that rule would not be re-approved. There are two points that EPA concedes. One is that there is a factual misstatement. The factual misstatement goes to the surplus requirement. Surplus. You now agree on that. Yes. It was a misstatement in the Federal Register to state that there had not been any rules that had been adopted. That, though, and we addressed this in our brief, so I won't go over it into detail, but there are sufficient credits in the tracking system. I don't remember if it was Judge Thomas or Judge Trott who had asked about what EPA had been doing. Right, exactly. Have you been sitting on your hands, to put it bluntly? No. I would think that in a minute somebody spotted something wrong and they said, well, let's do it right, and you'd be there by now. We made a motion for remand. Right. Turned down. That was denied. We thought that we have deep respect for the jurisdiction of the court and we thought that it would be inappropriate while the rule was under review within the court to proceed forward and actually notice a new rule. That said, EPA has done essentially has drafted large portions of what would be proposed and published into the Federal Register, but obviously that would have to be adapted to whatever the court. So what does that timetable look like then? If we say go, I mean, it's just a question, if you've got a draft, all you have to do is get the draft off out of it, have a new notice and comment period? Well, there will have to be adaptation of what has been drafted to date to whatever, however the court chooses to dispose of the case and remanding it back to the agency and then the requisite review that the government goes through and then sending it to the office, the government printing office, so that it will have to be signed and then it will be sent to the government printing office to be published. You're talking weeks, months, days, years, decades? I would say it will absolutely happen within 90 days, probably will happen within 60 days. It's hard to put an absolute date on it. So what's the problem with vacating, really? Right, well, you know, from EPA's perspective, we won't be harmed by a vacature. We're concerned about the effect that it has on the other parties who have intervened in this case, which is why we'd like to have them speak specifically to that. Sure, but don't you find it a little bit odd for the, I mean, the agency is basically saying the procedures we used in adopting the rule, we were arbitrary, we were capricious, but the rule's not so bad, and we've already made up our mind in the future, so the reanalysis of the data isn't going to make any difference. I mean, that's what you're saying. EPA has not conceded that the rule is arbitrary and capricious. There is, in Section 706, the EPA... No, but you've all but conceded in asking for a remand. Except that we believe that it's harmless error. We know this was bad, right? Yes, we concede that there are flaws in the rule. There is an open question as to whether that means that the rule is arbitrary and capricious, and we don't concede that it is arbitrary and capricious. In terms of, I understand that the other parties will talk about the real-world harms, but talk to me about the effect on the rule-making process. Will there be any effect on the rule-making process if the current rule is vacated or not? You have to start from scratch, right? You have to put out a regular notice. Does the fact that there is a rule in place that has not been vacated, does that in any way affect the standard by which the new rule will be effected? No. So the agency will not be effected at all? No. Okay. Well, maybe you should then, you've got seven minutes or so left. We do like to hear from the petition, or intervenors. May it please the Court. Good morning, Your Honors. Barbara Baird, District Counsel for the Southwest AQMD. And I'd like to make two points regarding the real-world harm that would result from a vacature. Now, a potential legal harm that hasn't been discussed in the argument this morning is that if the Court vacates the rule-making, the plaintiffs will likely argue that it can't be repeated and corrected. And the reason for this is the statute which authorized the AQMD to transfer the credits to the power plan in the first place expired by its own terms on January 1, 2012, as did the actual SIP revision which tracked the statute, although that SIP revision provided that such expiration does not affect the previously issued credits. So while there would be obviously litigation about this subject, there is a potential risk that a vacature would do much more harm than simply delaying the project but could derail the project. Also, we agree that we don't believe it's automatic that construction would have to stop, but as you see, the plaintiffs disagree and there will be litigation over that. Let me talk to you a moment about the environmental harm that would result if construction is stopped. All parties have not disputed that the plant is needed. The request for judicial notice that Sentinel submitted showed that there was peak electricity demand growing the equivalent of three new 500-megawatt power plants a year. If Sentinel cannot come online as scheduled, then, and it's also common knowledge in the area that the San Onofre generating station is currently down, so we're in a reduced supply. When is it scheduled to come online? It is not scheduled. I checked the website over the weekend and both the Cal ISO and SCE say there is no firm return date or any return date as of yet. So if there are blackouts next summer as a result of Sentinel being not available, this causes businesses to start up diesel backup generators so they don't have to shut down in hospitals and convalescent homes and so forth. There's some suggestion that there's a dispute over whether this is a non-attainment area and there's an attempt to make it an attainment area. Do you know anything about that? Yes, sir. Still a non-attainment area? It is technically classified as non-attainment by EPA because they have not yet approved formally through notice and comment our request to have the area re-designated as attainment. Diesel particulate is designated by the California Air Resources Board as a toxic air contaminant. Your argument basically is if we vacate the rule, they could raise arguments that you don't think are any good, and if credited, then it would cause these things next summer. That's correct, but it's also true that... You don't think they have a good argument for stopping construction, right? Well, we don't think so, but we think that there always is that possibility. I also want to point, though, to their indication of harm, which is it's true that if the plant doesn't get constructed and it wasn't really needed, then, in fact, there may not be blackouts. But if it wasn't really needed, then their environmental harm won't occur either because it won't be emitting and operating. So we're very concerned with the legal question of whether the petitioners are going to argue that... I thought I asked that question of opposing counsel, and I thought I got an answer, and her answer was that the mere construction causes environmental harms. Well, the... Are those the relevant harms, the construction harms? I thought it was the operating harms. I think they're primarily focused on the operating harms, and the construction harms, according to the Energy Commission findings, were determined to be insignificant with mitigation, and the mitigation for construction did not include the offsets in issue. I also want to point out to... Construction was not based on the offsets. No, it was not. It was considered to be insignificant in the first place. So can the plant, if we don't vacate and the process continues, will the plant go online without further action, or do they need a license or something like that? Let's say the construction is completed tomorrow, or next week, or... They don't need anything further from our agency, Your Honor. Perhaps Mr. Carroll could address whether the Energy Commission has any further requirements, but we do not. They can start whenever they're done commissioning the plant. Okay. Do you want to leave him some time for that? Yes, thank you. Okay. Good morning. I'm Mike Carroll with Latham & Watkins on behalf of CPV Sentinel, LLC. The CPV Sentinel Energy Project is a $1 billion investment of 100 percent private sector funds in California. That used to be serious money. Some people think that it still is. The project has undergone review for about five years now. Applications were submitted in June and July of 1997. The California legislature obviously saw fit to adopt project-specific legislation to see that this project did go forward. Many state and federal agencies... Let me just focus on the questions we've asked. Let me cut to the chase. If you do not vacate the rule, the outcome is certain. The project will continue construction as scheduled. It will come online as scheduled. Operation is scheduled to commence in November of this year, and it will be there when needed to meet the demands of the region for electricity to ensure that we do not have rolling blackouts, to ensure that we do not need to run standby diesel generators. If you vacate the rule, the world becomes very uncertain. We do not believe, as the petitioner suggests, that the permits need to be somehow affected or that construction stops immediately. However, it does open the door to a great deal of mischief, and we have seen a great deal of mischief over the five years of review of this project already. None of it successful, but a great deal of mischief nonetheless. We do think that an environment of uncertainty is very close to the standard in Western oil and gas. You're not going to stop construction? I hope not. No, no, I mean, if you get an order that says we vacate the rule, you have no plans of stopping construction? Oh, no. No, we will not affirmatively stop construction because as has been suggested, we've got 350 workers out there. This is a major construction project. It doesn't get turned off and turned back on very easily. So unless a court stops you, you're going to keep constructing? That is correct. But there could be a court that would step in and stop the project, and as petitioners have indicated, they plan to pursue that. And so I think what you're doing is you're opening... So let's say the plan gets miraculously completed tomorrow. Can it start operating under the current regime, or does it need further permits to actually start operating? The rule needs to be in place for it to start operating, either the current rule or a subsequent rule. So a rule needs to be in place. If we don't vacate, the rule will be in place and it can start operating? In theory, yes. Now, I would also like to focus on the petitioners have made much about the construction harms and the ongoing construction harms. This case doesn't have anything to do with construction emissions. The whole heart of the case is whether or not the offsets are valid. The offsets are required to offset the operational emissions associated with the project. They don't even come into play until the project starts operation. So this discussion of the construction emissions is completely irrelevant in the first place. Well, I think it's irrelevant to the merits. I think it may be relevant to the equitable considerations on whether or not to vacate the rule. I mean, those are two separate inquiries. I take your point. Well, to the extent you think they're relevant, the Energy Commission did make findings of fact and findings of law, as was previously indicated, that the construction emissions were insignificant with the mitigation put in place for the project. I mean, the fact of employment, in a sense, is not relevant to the rule, but it is relevant to whether or not we vacate. It's the same consideration. That's right. Well, we think that the equities weigh strongly in favor of not vacating the rule. We think that if you vacate the rule, you open the door to the sorts of mischief that has been suggested and that it is possible that construction will be delayed, that this project will not be available when it's needed, that that will result in adverse environmental impacts because it won't be there to meet the needs of the region. It means that old generation that's less efficient, dirtier, will continue to operate, that renewables that are dependent upon this project won't be able to come online. I'm just thinking out loud. Could we not vacate the rule and yet provide that the plant cannot come online until a valid rule is in place? I think you could certainly do that. Okay. Thank you. Thank you. Four minutes left, an eternity. Does anybody on the other side disagree with what was just said? In other words, we could not vacate but say the plant can't come online until there's a new rule? Would that be fine with everybody? Fear. That would be okay. Thank you, Your Honor. Boy, four minutes goes fast. I wanted to- Pretty efficient use of the rest of your time, so that's why I really meant an eternity. Go ahead. I did recognize that- If we vacate, I hear you saying you will go into some court immediately to try to stop construction, correct? Your Honor, I can't make that representation on behalf of communities standing here at this point, but I do believe that the state of- It's a real possibility. It is a real possibility. It is a potentiality. I wanted to be clear that if we are going into the world of balancing the equities on both sides, that the standard that's applied is to look at the likelihood that an agency would be able to reaffirm the rule as it is written, and it's a sliding scale. So the more likely that it is that this rule could stand as written, the less the harms. What is the problem with Judge Kaczynski's suggestion as a hypothetical that we were to not vacate, but with the understanding that the plant would not operate until a valid rule were in place? What's the problem with that? So, Your Honor, there are two problems. One of them is that this rule cannot be reaffirmed as it is written. So going through- It presupposes a valid rule in place. That's right, Your Honor. Are you saying at this point there's no possibility ever under any circumstances of a valid rule arising from this set of facts? Your Honor, I think I may be misunderstanding the question. Are you asking if the- Did you hear Judge Kaczynski's suggestion? That the rule stay in place? I said that we not vacate the current rule, but we hold that the plant cannot actually go online, start operating, until there's a valid rule in place. So, Your Honor, the idea would be to replace the existing rule with another rule when the other rule has gone through its rulemaking process? All Judge Kaczynski says, there's a valid rule in place, however it gets there. We know this one is not valid. We're not vacating it, but there has to be a valid rule in place before they can start operating. So, Your Honor, that's certainly an interesting proposition. What's the matter with it? The matter with it, Your Honor, is that this Court's job is not to leave in place flawed rules. The job, the Administrative Procedures Act says that a court shall set aside a rule that is adopted, a flawed rule. Okay. So leaving a flawed rule in place- Let me ask a different rule. You've argued that construction itself is causing environmental harm. What's on the record about that? So, Your Honor, the Energy Commission's analysis of the air quality impacts shows that unmitigated impacts would rise to over 400 percent- We've been told that the measurement was that they're going to be or are insignificant with the mitigation factors in place. So what I hear is there's stuff going on, there's crud going into the air, but there's enough mitigation, so whatever it is is insignificant. Is that the official ruling? So, Your Honor, that's not exactly what the Energy Commission said. What it said was it believes that the mitigation would reduce to insignificant. So it's an important distinction. There are a lot of potentials there. We believe that this mitigation will work. Offsets don't come into play. The offsets only have to do with operation. Right. Are we talking about particulate emission from construction activity? Is that what we're talking about? Yes, Your Honor. That's it? Yes. And you mitigate that by using water dampeners, that sort of thing? Your Honor, the specific mitigation isn't in the record, unfortunately. But you use the usual dust suppressants? Yes, ordinarily diesel from construction equipment. I think that there's a deeper harm that's being overlooked here, which is the harm to the public trust, and leaving in place a rule that- All right, well, let's say we vacate the rule, but we also make it clear that we're not going to stop construction. What's wrong with that? Your Honor, I don't quite understand how vacating the rule would not stop construction. I've heard the discussions about it. Well, because they certainly continue to take at their own risk to continue to build, and they say they're going to. There's nothing in vacating the rule that indicates that we're stopping construction. If we make that plain, what's wrong with that? So, Your Honor, there is a federally approved rule in the South Coast that says that Sentinel must have valid offsets that it has surrendered before it begins construction. So this Court's saying these offsets aren't valid, but we're still going to allow construction to go forward. We're not saying that at all. We're saying there has to be a valid rule in place before the thing can operate. There are two sides of the coin. If the Court's intent is to not stop construction, we can either say that explicitly and vacate the rule or adopt Chief Judge Kaczynski's suggestion of he keep the rule in place, but say it can't commence operations. I gather from your public trust argument you would prefer us to vacate the rule and say construction continues, given those two alternatives. Your Honor, that is correct. And I know neither of those are your preferred alternatives. That's right, Your Honor. We have members who breathe the air in the Coachella Valley who are actually being affected by the construction of this plant. And I wanted to point out that some of the discussion of harms and impacts and the concern about electrical reliability is far beyond what's in this record. That's not part of the challenge. The construction, whatever pollution there is, whatever they're breathing as well as construction, isn't part of this challenge. What we're dealing with is offsets which deal with operation. Construction, they may be harmed by it. They may have an interest sufficient to maintain standing. But that's really not what this case is about, as it now appears before us. So, Your Honor, the construction harms are real harms. And I realize that you're asking a specific question. I'm not disputing that. I realize that you're asking a specific question about what offsets, what is being offset. So operational emissions are being offset. Construction impacts are supposed to be addressed through mitigation. And you don't have a challenge dealing with that aspect of construction, the mitigation. That is not before us. So, Your Honor, to the... I'm asking a question. Is that before us or not? Yes, Your Honor, it is before you because federal law in the South Coast requires that valid offsets be surrendered prior to construction. No, I think it's a different question we're asking. In other words, you've had some determinations with mitigation that construction activities will have a de minimis effect on the environment. You're not challenging that in this litigation? That's correct, Your Honor. And for us to say that, in fact, they would have major effects on the environment would reach into matters that have already been determined, right? I think it's within this court's jurisdiction to assess the harms to the extent that we're weighing harms that have been pled and for which there's support in the record. Beyond that, that's right. So is there anything in the record indicating you don't think that the plan is mitigating construction pollution? Your Honor, our members have testified to the effect that they go and they use the Coachella Valley. One of the community's members lives in the area. Beyond alleging that they will be harmed, no. I didn't mean to get us into a new area. Thank you very much. I want to thank counsel. I think both sides were very good and very helpful. We are now case argued and submitted. We are now adjourned. Thank you. Thank you. All rise. This court is adjourned. This court is adjourned.
judges: Kozinski, Trott, Thomas